UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JERMAINE MARSHALL,

    Plaintiff,

    v.

MARGARET DAWSON,

    Defendant.

CAUSE NO.: 3:17-CV-11-PPS-MGG

OPINION AND ORDER

Jermaine Marshall, a prisoner without a lawyer, proceeds on an Eighth Amendment claim of deliberate indifference to his serious medical needs against Margaret Dawson. He alleges that Dawson was aware of his mental condition and deprived him of psychiatric medication beginning on August 22, 2016, which resulted in his attempted suicide one month later. Dawson filed a motion for summary judgment, arguing that she did not act with deliberate indifference but relied on her medical judgment.

Dawson also provided Marshall with the summary judgment notice required by N.D. Ind. L.R. 56-1 and a copy of both Federal Rule of Civil Procedure 56 and Local Rule 56-1. ECF 40. The notice informed Marshall of the importance of filing a response. It advised that, unless he disputed the facts presented by Dawson, the court could accept those facts as true. *See* Fed. R. Civ. P. 56(e). It further advised that a lack of response could result in the dismissal of his case. *See* Fed. R. Civ. P. 56(a). Nevertheless, Marshall did not file a response.

FACTS

Margaret Dawson works as a psychiatric nurse practitioner at the Miami Correctional Facility. ECF 39-2 at 1. Dawson submitted an affidavit (ECF 39-2) and the relevant medical records for Marshall's time in the custody of the Department of Corrections (ECF 39-3), which revealed the following. On January 9, 2015, Marshall underwent an initial psychiatric evaluation at the Reception Diagnostic Center. *Id.* at 31-34. He reported hearing voices and a two-week hospitalization in Kentucky for hallucinations. *Id.* He also reported a history of getting into fights and substance abuse. He received diagnoses of paranoid schizophrenia and polysubstance dependence and was prescribed Risperdal, an antipsychotic. *Id.*

On March 5, 2015, following his transfer to the Miami Correctional Facility, Dawson saw Marshall for the first time for medication management. *Id.* at 28-30. She renewed his Risperdal prescription based on his report that it effectively reduced auditory hallucinations. *Id.*

On September 3, 2015, Marshall reported that he was expelled from the GED program due to an altercation and did not have a job. *Id.* at 17-19. Dawson began to question the schizophrenia diagnosis as well as Marshall's need for Risperdal. *Id.* She observed that his presentation was not consistent with severe mental illness and saw no impairment with his ability to function. *Id.* She also noted that he received conduct reports even when receiving Risperdal. *Id.* When she raised these concerns, Marshall became defensive, and continued to argue until a correctional officer instructed him to leave the building. *Id.* Dawson suspected that Marshall might have been attempting to

2

manipulate her for secondary gain. *Id.* She diagnosed Marshall with antisocial personality disorder and discontinued Risperdal. *Id.*

According to Dawson's expertise, the symptoms of paranoid schizophrenia include anxiety, delusions, hallucinations, disorganized thinking or speech, abnormal motor behavior, and lack of an ability to function normally, including lack of eye contact and flat affect. ECF 39-2 at 2-3. Other symptoms include reluctance to acknowledge one's diagnosis and an unwillingness to take antipsychotic medication. *Id.* The symptoms of antisocial personality disorder include the tendency to manipulate and treat others harshly or with callous indifference, aggressive or violent behavior, lying, impulsive behavior, inability to sustain consistent work behavior, and substance abuse. *Id.* No medication specifically treats antisocial personality disorder, but medication may be prescribed for depression or anxiety. *Id.* Psychotherapy, including anger management training, is also used to treat the disorder. *Id.*

On September 24, 2015, Marshall complained of aggravation and not wanting to be around people. ECF 39-3 at 11-13. Dawson reviewed Marshall's medical history, noting that, though he persistently requested medication, he did not present with symptoms consistent with paranoid schizophrenia. *Id.* Marshall was offered additional therapy sessions but was denied medication. *Id.* Marshall continued to argue, leaving only the office after being asked several times. *Id.* Dawson determined that there was no clinical indication for medication, no impairment in his ability to function, and that Marshall was seeking drugs for himself or for secondary gain. *Id.*

3

Shortly thereafter, Marshall transferred to a different correctional facility. ECF 39-2 at 7. At that facility, Marshall requested Risperdal from a physician and complained of anxiety and paranoia. ECF 39-3 at 8-10. The physician resumed the prescription for Risperdal. *Id.* On June 21, 2016, Marshall returned to the Miami Correctional Facility and was placed in the restrictive housing unit. *Id.* at 161-62

On July 19, 2016, Dawson saw Marshall for medication management, and she renewed his prescription for Risperdal. *Id.* at 142-45. He indicated that he was first diagnosed with schizophrenia about one year ago upon his entry into the correctional system and that he had had no job since age sixteen. *Id.* Dawson observed Marshall in the waiting area conversing and laughing with another inmate. *Id.* She requested that he sign an authorization for her to obtain medical records from his mental health-related hospital stay in Kentucky, and he agreed. *Id.* She reasoned that she needed to verify Marshall's reported medical history. *Id.* According to her expertise, mental health patients may not be forthcoming or aware of their diagnoses and may also try to manipulate medical treatment through self-reporting. ECF 39-2 at 9-10.

On August 12, 2016, a nurse observed that, when she gave Marshall two Excedrin pills and one Risperdal pill, he moved the Risperdal pill to the other hand as he approached the water fountain, which suggested an attempt to divert Risperdal. ECF 39-3 at 138. When the nurse asked to see the pills in Marshall's hands, he said that he had accidentally dropped the Risperdal pill. *Id.*

On August 23, 2016, Dawson discontinued Marshall's prescription of Risperdal based on his refusal to sign a medical records authorization form, his attempt to divert

his medication, and her previous doubts regarding the paranoid schizophrenia diagnosis. *Id.* at 130-32. She concluded that his symptoms were more consistent with antisocial personality disorder and that discontinuation would not result in significant withdrawal symptoms. *Id.* She planned to follow up with Marshall in one month and to discuss his treatment plan at the weekly mental health meeting. *Id.*

On August 26, 2016, during an individual psychotherapy session with Barbara Gibbs, Marshall again refused to sign the medical records authorization and requested medication. *Id.* at 126-29. He also denied suicidal ideation. *Id.* Gibbs observed alert, pleasant, cooperative behavior and no evidence of significant impairment or distress. *Id.* She noted that Marshall was actively and appropriately participating in anger management classes and that he had no disciplinary issues since his arrival at the Miami Correctional Facility. *Id.* She discussed cognitive behavioral therapy skills to manage anger and depression and gave him a self-help packet for him to complete. *Id.* She also consulted with the facility psychologist. *Id.* On August 30, 2016, Marshall was discussed at the weekly mental health meeting, which are held to ensure continuity of care from the mental health staff. *Id.* at 120.

On September 6, 2016, during an individual psychotherapy session with Gibbs, Marshall demanded medication, reported auditory hallucinations, and stated that Dawson needed to lose her job. *Id.* at 123-25. He reported his refusal to work on the self-help packet and denied suicidal ideation. *Id.* She observed that Marshall did not appear interested in any treatment other than medication. *Id.* On September 8, 2016, medical staff again discussed Marshall at the weekly mental health meeting. *Id.* at 121.

On September 20, 2016, Marshall complained of auditory and visual hallucinations and frequent bouts of yelling and refused to sign a medical records authorization. *Id.* at 117-19. Dawson observed no psychotic symptoms, involuntary movements, or impairment of function. *Id.* When Dawson informed Marshall that she saw no need for medication, he became angry, told her that "God doesn't like ugly people," and required an escort back to his cell. *Id.* She concluded that Marshall's behavior strongly suggested antisocial personality disorder and drug-seeking behavior but was inconsistent with paranoid schizophrenia. *Id.* She reasoned that bouts of yelling is not a symptom of schizophrenia and that visual hallucinations are extremely rare. ECF 39-2 at 14-15. She also reasoned that Marshall did not show objective indications of auditory hallucinations, such as responding to the stimuli, and did not show symptoms such as lack of eye contact, flat affect, or social withdrawal. *Id.* She also considered Marshall's refusal to sign the medical records authorization, his refusal to learn coping mechanisms, his fixation on obtaining medication, and his attempt to divert Risperdal. *Id.* Moreover, Marshall had never expressed suicidal ideation or indicated symptoms of suicidal intent. *Id.*

On September 21, 2016, Marshall attempted to hang himself in his cell with a bed sheet. ECF 39-3 at 109. He suffered no physical injuries, and complained of not receiving medication, hearing voices, seeing shadow people, and being unable to handle it. *Id.* He was them placed in the restrictive housing unit. *Id.* at 110-12.

On September 22, 2016, a mental health counselor observed that Marshall was talkative, had logical and linear thinking, and had no indications of auditory or visual

6

hallucinations. *Id.* at 105-08. He denied suicidal ideation and continued to complain about his medication. *Id.* She found that Marshall's reason for attempting suicide was a "combination of a desire to manipulate and to escape." *Id.*

On October 5, 2016, Marshall transferred to the Pendleton Correctional Facility for diagnostic testing. *Id.* at 52-56. On January 12, 2017, Marshall refused to complete diagnostic testing and was described as evasive, mistrustful, demanding, and manipulative. *Id.* at 185-86. A physician at the Pendleton Correctional Facility suspected that Marshall's requests and commentary about medication might indicate substance abuse disorder, but the physician continued Marshall on Risperdal. *Id.* at 197-204.

Though Marshall did not file a response to the motion, I have reviewed Marshall's verified complaint and the attached exhibits. In the complaint, he alleges that Dawson discontinued his medication because she did not have a clear diagnosis and because he would not sign the medical records authorization. ECF 1 at 2. He also submitted a psychological evaluation that was conducted to determine his competency to stand trial. ECF 1-1 at 14-16. According to the evaluation, Marshall reported a significant history of substance abuse, including marijuana, alcohol, Ritalin, Nyquil, pain medication, Adderall, and Lortab, and that his daily use resulted in his mother evicting him from her residence. *Id.* He also reported psychotic symptoms, including hallucinations and paranoia, but the psychologist noted that the symptoms could not be independently verified and could be caused by substance abuse. *Id.* The psychologist concluded that Marshall was competent to stand trial. *Id.*

## STANDARD OF REVIEW

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

## ANALYSIS

Marshall alleges that Dawson acted with deliberate indifference to his serious medical needs by denying him medication. Dawson argues that she did not act with deliberate indifference in treating Marshall but relied on her medical judgment. Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted

8

with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

Deliberate indifference is a high standard, and is "something approaching a total unconcern for [a prisoner's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (internal quotation marks and citations omitted). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks omitted). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

9

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698 (internal quotation marks and citations omitted). Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

The record unequivocally reflects that Dawson discontinued Marshall's prescription for Risperdal based on her medical judgment, relying on her medical expertise and experience and considering numerous relevant factors. She observed that Marshall did not show the symptoms of paranoid schizophrenia, including objective

signs of hallucinations, flat affect, a lack of eye contact, an inability to appreciate his diagnosis, a reluctance to take medication, disorganized thinking or speech, abnormal motor behavior, or a lack of an ability to function normally. Instead, she observed that Marshall's behavior was consistent with antisocial personality disorder and drug-seeking behavior. Specifically, she observed that he persistently demanded medication, refused to cooperate with other aspects of his treatment, had a substantial history of substance abuse, could not maintain steady employment, received misconduct reports even while prescribed Risperdal, was talkative, and usually presented with a pleasant demeanor until he was told that he was not getting medication. She also determined that discontinuing Risperdal would not result in significant withdrawal symptoms. Further, after Dawson discontinued the prescription, the mental health staff continued to monitor Marshall through evaluations, therapy sessions, consulting among one another, and asking about his presentation at anger management classes and in his cell house. Though Marshall ultimately attempted suicide, he never exhibited or expressed suicidal ideations prior to the attempt.

The record is also clear that medical staff at other correctional facilities may have disagreed with Dawson's diagnosis and course of treatment as shown by their prescriptions for Risperdal. Nevertheless, this disagreement does not mean that Dawson's assessment was incorrect, and even an incorrect assessment does not amount to deliberate indifference if the assessment is based on medical judgment. *See Jacksonr*, 541 F.3d at 697-98. Moreover, Dawson considered the treatment provided by other medical staff, noting that the paranoid schizophrenia diagnosis and Risperdal

prescription appeared to stem solely from Marshall's subjective reports, and other medical professionals also questioned the diagnosis.

Additionally, Marshall alleges that Dawson discontinued his medication because she did not have a clear diagnosis and because he would not sign the medical records authorization form, suggesting that these were improper reasons for doing so. However, considering the circumstances, these reasons were legitimate medical reasons for discontinuing the medication. As detailed above, Dawson observed a lack of symptoms to support the paranoid schizophrenia diagnosis, which reasonably caused her to question the diagnosis and suggested that the Risperdal prescription was not appropriate. Instead of immediately discontinuing the prescription, she attempted to obtain more information by gathering Marshall's prior medical records. Marshall's refusal to sign the medical authorization prevented her from obtaining this information, which reasonably played a role in her ultimate conclusion that Marshall did not have paranoid schizophrenia and in her decision to discontinue Risperdal.

In sum, the record contains no evidence to suggest that Dawson acted with deliberate indifference to Marshall's serious medical needs by discontinuing his prescription for Risperdal. Rather, the undisputed record indicates that Dawson discontinued the prescription based on her medical judgment.

For these reasons, the court:

(1) GRANTS the motion for summary judgment; and

(2) DIRECTS the clerk to enter judgment and to close this case.

SO ORDERED on June 25, 2018.

s/ Philip P. Simon
                                        JUDGE
                                        UNITED STATES DISTRICT COURT